39 F.3d 919
 The PEOPLE OF the STATE OF CALIFORNIA, et al., Petitioners,
Public Service Commission of the District of Columbia, et
al., Petitioners-Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION, et al., Respondents,
BellSouth Corporation, et al., Respondents-Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
Maryland People's Counsel, et al., Petitioners-Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION, et al., Respondents,
Voice-Tel Enterprises, Inc., et al., Respondents-Intervenors.
STATE OF NEW YORK, et al., Petitioners,
Maryland People's Counsel, et al., Petitioners-Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION, et al., Respondents,
Voice-Tel Enterprises, Inc., et al., Respondents-Intervenors.
AMERICAN NEWSPAPER PUBLISHERS ASSOCIATION ("ANPA"), et al.,
Petitioners,
BellSouth Corporation, et al., Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION, et al., Respondents.
 Nos. 92-70083, 92-70186, 92-70217 and 92-70261.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 11, 1994.
Decided Oct. 18, 1994.
 
 Richard E. Wiley, Michael Yourshaw and William B. Baker, Wiley, Rein & Fielding, John F. Sturm, Washington, DC, for petitioners Newspaper Ass'n of America.
 Frank W. Krogh, and Donald J. Elardo, Washington, DC, for petitioners MCI Telecommunications Corp.
 Ellen S. LeVine, Peter Arth, Jr. and Edward W. O'Neill, San Francisco, CA, for petitioners People of State of Cal. and Public Utilities Com'n of State of Cal.
 William J. Cowan, Albany, NY, Gen. Counsel to petitioner Public Service Com'n of State of N.Y.
 Renee Licht, Daniel M. Armstrong, John E. Ingle, Laurence N. Bourne and James M. Carr, Washington, DC, for respondent F.C.C.
 Anne K. Bingaman, Asst. Atty. Gen., Catherine G. O'Sullivan and Nancy C. Garrison, U.S. Dept. of Justice, for respondent U.S.
 JoAnne G. Bloom, Hoffman Estates, IL, for Ill., Ind., Mich., Ohio, and Wis. Bell Telephone Companies.
 Robert J. Butler and Angela Burnett, Washington, DC, for Information Industry Ass'n.
 Joseph P. Markoski, Squire, Sanders & Dempsey, Washington, DC, for Information Technology Ass'n of America.
 Martin T. McCue, Alfred W. Whittaker, Kirkland & Ellis, Washington, DC, for U.S. Telephone Assoc.
 Mary McDermott and Shelley E. Harms, White Plains, NY, for New York and New England Telephone Companies.
 Robert B. McKenna, Denver, CO, and Washington, DC, for U.S. West Communications, Inc.
 M. Robert Sutherland, Atlanta, GA, for BellSouth Corp. and BellSouth Telecommunications, Inc.
 John Thorne, Washington, DC, for Bell Atlantic Telephone Company.
 James P. Tuthill, San Francisco, CA, James L. Wurtz, Washington, DC, for Pacific Bell and Nevada Bell.
 Alfred W. Whittaker, Kirkland & Ellis, Washington, DC, for Bell Operating Companies.
 Robert M. Lynch, Richard C. Hartgrove, Michael J. Zpevak, St. Louis, MO, for Southwestern Bell Telephone Co.
 J. Roger Wollenberg, William T. Lake and Jonathan Jacob Nadler, Wilmer, Cutler & Pickering, Washington, DC, and Sheila J. McCartney, Stamford, CT, for Intern. Business Mach. Corp.
 David W. Carpenter, Peter D. Keisler, Sidley & Austin, Chicago, IL, and Francine J. Berry, John J. Langhauser, Basking Ridge, NJ, for American Tel. & Tel. Co.
 Robert L. Duston, Schmeltzer, Aptaker & Shepard, PC, Washington, DC, and John Glynn, Baltimore, MD, for Maryland People's Counsel.
 Philip McClelland, Harrisburg, PA, for Pa. Office of Consumer Advocate.
 Randolph J. May, Sutherland, Asbill & Brennan, Washington, DC, for Compuserve, Inc.
 Paul Rodgers, Washington, DC, for Nat. Ass'n of Regulatory Utility Com'rs.
 Veronica A. Smith, Harrisburg, PA, Pa. Public Utility Com'n.
 Robert D. Vandiver, Tallahassee, FL, for Fla. Public Service Com'n.
 Appeal from an Order of the Federal Communications Commission.
 Before: SCHROEDER, NELSON, and CANBY, Jr., Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 We review the order that the Federal Communications Commission entered as a result of our decision in California v. FCC, 905 F.2d 1217 (9th Cir.1990) (California I ). In that case, we remanded for reconsideration certain FCC orders, known as Computer III,[1] that specified the conditions under which the Regional Bell Operating Companies (BOCs) could provide enhanced computerized data services to their customers in addition to providing basic telephone service. Computer III eliminated earlier requirements that the BOCs maintain separate corporate structures for the provision of enhanced services. Because state regulations had also required structural separation, Computer III also ordered that such state requirements be preempted by the federal directive.
 
 
 2
 In California I we remanded for the FCC to reconsider certain aspects of the cost benefit analysis underlying the elimination of structural separation. We also directed the FCC to reconsider its preemption order in light of the Federal Communications Act requirement that preemption be narrowly tailored to promote dual, state and federal, regulatory goals.
 
 
 3
 In the order issued on remand, Computer III Remand Proceedings Order,[2] the FCC once again eliminated structural separation requirements, but imposed strengthened nonstructural safeguards intended to address the concerns we expressed in California I. The FCC also modified its preemption order so that it no longer purported to preempt all state structural separation requirements, but only those affecting services that include both interstate and intrastate communications.
 
 
 4
 After California I, but before the entry of the Computer III Remand Proceedings Order, (hereafter Order on Remand ), petitioners in this proceeding also attacked a related series of FCC orders.[3] We reviewed those orders in California v. FCC, 4 F.3d 1505 (9th Cir.1993) (California II ). We agreed with petitioners in that case that the orders under consideration amounted to a retreat from the policy announced in Computer III of achieving the concept known as open network architecture (ONA) as a precondition to structural separation. Id. at 1512. We held that ONA as envisioned in Computer III would have provided all enhanced service providers equal access to the components of the BOCs' telephonic network. We held, however, that the change in policy itself did not violate the Administrative Procedures Act, because it was adequately explained by the technological inability to achieve complete ONA. Id. at 1513.
 
 
 5
 At the time we were considering California II, the Commission had already entered the Order on Remand, but petitions for review of that decision had not yet been briefed. We therefore declined to decide whether the ONA policy change had an effect on the validity of the FCC's decision to eliminate structural separation. We held that all such issues should await our consideration of this order. Id.
 
 
 6
 Petitioners in this case are the same as petitioners in California I and California II, and are divided into two sets. The first, described collectively as MCI,[4] are competitors of the BOCs in providing enhanced services to telephone customers. They once again challenge the FCC's cost benefit analysis in eliminating structural separation, contending that the nonstructural safeguards are inadequate to prevent anticompetitive behavior by the BOCs. The second set of petitioners, represented by the States of California and New York,[5] challenge the modified preemption aspects of the Order on Remand.
 
 
 7
 We first consider MCI's petition challenging the elimination of structural separation. We hold that the FCC adequately responded to the concerns we expressed in California I by increasing the nonstructural safeguards designed to prevent the BOCs from passing on the costs of their enhanced services to their telephone customers paying regulated rates. We further hold, however, that the FCC's overall cost benefit analysis remains flawed. In Computer III, the FCC concluded that full ONA would be necessary to ensure fair competition between the BOCs and MCI in the absence of structural separation. We held in California II that the FCC had retreated from its position that full ONA was a prerequisite for eliminating structural separation to ensure access to the BOCs' networks. The Order on Remand does not take this change into account. Therefore, once again we remand for reconsideration of the cost benefit analysis with respect to structural separation.
 
 
 8
 In the California and New York petitions, we hold that the FCC has adequately addressed the concerns we raised in California I. We therefore affirm the preemption aspects of the FCC's Order on Remand.
 
 II. STRUCTURAL SEPARATION
 Background
 
 9
 In this case we deal with the "enhanced services industry" that in three decades has transformed the telephone lines into an information super highway. Enhanced services use computerized data processing to bring an ever expanding variety of information to users over the telephone communications network. That network is controlled by the Regional Bell Operating Companies that maintain monopolies over local telephone service that are regulated by the Federal Communications Commission.
 
 
 10
 From the inception of the enhanced services industry, the FCC has declined to regulate it in the interest of promoting competition among providers of enhanced services.[6] The FCC was concerned, however, that the telephone industry could use its monopoly of the lines to prevent competition from developing in the enhanced services industry. It sought to prevent the telephone carriers, which were eager to enter the enhanced services industry, from exploiting their monopoly over the telephone lines to obtain an unfair advantage. Therefore, in its Second Computer Inquiry,[7] the FCC in 1980 ordered that AT & T and its local exchange affiliates at that time, the Bell operating companies, form separate companies to provide enhanced services, companies that would have complete structural separation from the companies that provided basic telephone service. After the breakup of AT & T and the divestment of the Regional Bell Operating Companies, the FCC ordered that the BOCs maintain structural separation between their basic telephone operations and subsidiary entities providing enhanced services.[8]
 
 
 11
 The FCC adopted structural separation to prevent two problems. First, the FCC was concerned that the BOCs would gain an unfair competitive edge in the enhanced services industry by discriminating in favor of their own enhanced services in providing access to the telephone transmission facilities. Second, the FCC sought to prevent the BOCs from exploiting their monopolies over the telephone industry by cross-subsidization: passing on the costs of their enhanced services to regular telephone ratepayers who are required to use the carriers because of their monopoly over local phone services. These concerns are more fully discussed in California I. See 905 F.2d at 1224.
 
 
 12
 The structural separation requirement imposed by Computer II required the BOCs to produce and market enhanced services independent of their basic telephone services. Accordingly, the BOCs' enhanced service subsidiaries were required to maintain separate physical facilities, separate personnel, and different accounting records. The FCC determined that structural separation would make it difficult for the BOCs to cross-subsidize and that it would reduce the chance of access discrimination by putting the BOCs' enhanced service subsidiaries on equal footing with independent enhanced service providers when seeking transmission services.
 
 
 13
 In 1986, the FCC issued its Computer III decision in which it changed its position and ordered that structural separation requirements be eliminated. As we summarized in California II,
 
 
 14
 The FCC reasoned that the BOCs' divestiture from AT & T and increased market competition had diminished the value of structural separation as a safeguard against monopoly abuse. Moreover, the FCC concluded that the costs of structural separation exceeded its public benefits. Nevertheless, because the FCC found that the BOCs continued to have monopoly power over access to the telephone transmission facilities, the FCC proposed to replace the structural separation requirements with nonstructural regulations.
 
 
 15
 4 F.3d at 1508.
 
 
 16
 In California I we reviewed MCI's challenge to Computer III. We summarized petitioners' claims as follows:
 
 
 17
 Petitioners claim that it was irrational for the FCC to abandon structural safeguards so soon after imposing them on AT & T in Computer II and reimposing them on the divested BOCs.... Structural safeguards, argue petitioners, have been the Commission's primary weapon for preventing anticompetitive conduct such as cross-subsidization and discriminatory access, and these safeguards ... are a long-standing FCC rule which was abandoned without a reasoned agency decision.
 
 
 18
 905 F.2d at 1230.
 
 
 19
 In California I we first determined that the FCC could reasonably have concluded on the record before it that structural separation impeded the development and marketing of some new forms of enhanced services. Id. at 1232. We found that the FCC had made a "plausible case" that lifting the structural separation requirement would benefit consumers by permitting the BOCs to operate more efficiently in the enhanced services market. Id. at 1238.
 
 
 20
 Second, we concluded that the FCC had also made a "plausible case" that nonstructural safeguards based on the development of new technology, including open network architecture (ONA) and comparably efficient interconnection (CEI), would effectively reduce the risk of BOC access discrimination once the structural separation requirement was lifted. Id. at 1233, 1238.
 
 
 21
 Third, we found that the record did not support the FCC's conclusion that market and technological changes had reduced the danger of cross-subsidization. Id. at 1233-38. Accordingly, we held that it was arbitrary and capricious for the FCC to replace structural separation with cost accounting regulations to protect against the harmful effects of cross-subsidization. Id. at 1238. We vacated the orders and remanded. However, the FCC entered an order granting waivers of the structural separation requirements; consequently, the BOCs have continued to provide enhanced services on an integrated basis.
 
 
 22
 In this petition, we must again review the FCC's weighing of the costs and benefits of structural separation.
 
 Standard of Review
 
 23
 Section 10(e) of the Administrative Procedure Act requires a reviewing court to set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C Sec. 706(2)(A). We must "determine whether the [FCC's] decision was a reasonable exercise of its discretion, based on consideration of relevant factors, and supported by the record." California I, 905 F.2d at 1230. The scope of judicial review under this standard is narrow and an agency's interpretation of its own policies and prior orders is entitled to deference. Id. Nevertheless, although the standard of review is deferential, it may not be uncritical. Id. We therefore may require the agency to provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored. Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co., 463 U.S. 29, 43-44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (State Farm ); Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413, 1425 (D.C.Cir.1983). Moreover, if the record reveals that the agency has " 'failed to consider an important aspect of the problem' or has 'offered an explanation for its decision that runs counter to the evidence before [it],' " we must find the agency in violation of the APA. California I, 905 F.2d at 1230 (quoting State Farm, 463 U.S. at 43, 103 S.Ct. at 2867).
 
 
 24
 Costs of Structural Separation: The Value of Voice Mail
 
 
 25
 The principal costs of structural separation in the eyes of the FCC have been the discouragement of innovation, the prevention of efficiency in the packages of services offered consumers, and the duplication of organizations and facilities. One example of discouragement of innovation has been the prevention of the development of the voicemail market for small customers. MCI contends that the FCC placed too much emphasis on the BOCs as the only potential source of mass market enhanced services and ignored the impact of anticompetitive behavior of the BOCs in preventing competitors from offering enhanced services. MCI further contends that the FCC overemphasized the importance of voice mail, which represents only one in a large array of enhanced services. In California I, we were less than laudatory in our assessment of the FCC's analysis of the costs of structural separation and expressed concern that the only concrete example the FCC used to support its cost analysis was voice mail. 905 F.2d at 1232. Nevertheless, we recognized that it was not arbitrary or capricious for the FCC to determine that the inability of the BOCs to develop this market is a substantial cost of structural separation. See id. Petitioners have not raised any new claims with regard to the FCC's analysis of the costs of structural separation which would require us to reconsider our conclusion in California I. Accordingly, we turn to the FCC's response to our concerns about cross-subsidization.The Adequacy of the FCC's Response to California I's
 
 Decision on Cross-Subsidization
 
 26
 Because the inadequacies of Computer III upon which we focused in California I dealt with the nonstructural measures relating to cross-subsidization, the FCC on remand directed its primary attention to strengthening the protections against cross-subsidization. On remand, the FCC established additional regulatory safeguards designed to reduce cross-subsidization.
 
 
 27
 First, the FCC adopted mandatory price cap regulation for the BOCs. Under price caps, a BOC's rates are governed by factors outside of its control, such as the inflation index, rather than by direct costs. Thus, a BOC would have little incentive to shift costs from nonregulated activities to regulated ones because it would not be able to increase regulated rates to recapture those costs. Second, the FCC established new cost accounting rules that would make cross-subsidization easier to detect. These rules included (1) joint cost rules, which provide that nonregulated enhanced services must contribute to overhead costs of regulated BOC operations, (2) cost allocation manuals, (3) annual audits by independent auditors, in which the auditor must evaluate whether the company's financial statements conform with generally accepted accounting principles, (4) reporting requirements under a new, uniform, detailed, computerized system known as the Automated Reporting and Management Information System, and (5) on-site audits conducted by FCC staff.
 
 
 28
 MCI argues that the FCC failed to provide record evidence to demonstrate the effectiveness of the accounting safeguards. The FCC counters that price cap regulation and the strengthened cost accounting rules, all of which were adopted after Computer III, are sufficient to reduce the danger of cross-subsidization. In addition, the FCC argues that regulators can use the seven BOCs as benchmarks against each other in detecting improper cost-shifting. The FCC acknowledges that it is making a predictive judgment that these measures will be effective, but argues that it is within its authority as a regulatory agency to do so and that it has supported its judgment with reasoned analysis and due consideration of the record.
 
 
 29
 In California I, we concluded that the FCC had unreasonably reversed, without adequate explanation, its previous position that cost-accounting regulations alone would fail to guard against cross-subsidization. See California I, 905 F.2d at 1233. We recognized that changes in the telecommunications market, such as development of competing cable and microwave communication systems, could reduce incentives to cross-subsidize. Nonetheless, we rejected the FCC's reliance on changes in the telecommunications market to reduce the danger of cross-subsidization. See id. at 1233-38. On remand, the FCC has taken specific affirmative steps designed to deter and detect cross-subsidization by introducing price caps as well as further strengthening its cost accounting rules. We conclude that with the implementation of these measures, the FCC has responded to our concerns about the weakness of its position in Computer III and has demonstrated that the BOCs' incentive and ability to cross-subsidize will be significantly reduced. That the efficacy of these measures has yet to be proven is not in and of itself a basis for finding the FCC's decision arbitrary and capricious. See, e.g., American Postal Workers Union v. United States Postal Serv., 891 F.2d 304, 314 (D.C.Cir.1989) (noting that "agencies are entitled to engage in predictive judgments" and that " 'complete factual support' is not required where such predictions 'necessarily involve[ ] deductions based on the expert knowledge of the agency' " (quoting FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978))).
 
 
 30
 Our conclusion is bolstered by the intervening decision of the D.C. Circuit that considered whether the FCC's new regulations would reduce the danger of cross-subsidization. United States v. Western Elec. Co., 993 F.2d 1572 (D.C.Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993). The D.C. Circuit concluded that price cap regulation "reduces any BOC's ability to shift costs from unregulated to regulated activities, because the increase in costs for the regulated activity does not automatically cause an increase in the legal rate ceiling." Id. at 1580. The court also found that the FCC had "tighten[ed] its accounting rules, especially its treatment of joint costs, all tending to increase the chances of catching any attempts at cost-shifting," id. at 1580-81, and that regulators and competitors could use the seven BOCs as benchmarks against each other to detect predatory pricing, id. at 1580. Finally, the court found that pressure on the BOCs to keep residential service rates low undermined the theory of regulatory capture on which successful cross-subsidization depends. Id. at 1581.
 
 
 31
 The Implementation of ONA after Computer III
 
 
 32
 Our review of the validity of the FCC's Order on Remand eliminating structural separation requirements has begun with our determination that the FCC has now adequately strengthened the protections against cross-subsidization and therefore has addressed the concerns expressed by this court in California I. Our review of this order cannot end with that determination, however. In entering the Order on Remand, the FCC was acting not only on the basis of our decision in California I but also in the wake of its additional orders regarding open network architecture, ONA. We held in California II that the FCC's ONA orders, now integrated into the Order on Remand, represented a change in policy from ONA as envisioned in Computer III. MCI now contends the changed policy undermines the validity of this order eliminating structural separation because, in light of the policy change, there are no longer adequate safeguards against discrimination in access. It is to that contention that we now turn.
 
 
 33
 In Computer III the FCC ordered the BOCs to develop plans for ONA that would permit enhanced service providers to achieve maximum flexibility in gaining access to telephone transmission facilities thereby allowing them to offer innovative packages of services to consumers. The FCC determined that the open network architecture requirements would be "self-enforcing in controlling discrimination." Computer III, 104 F.C.C.2d at 1063.
 
 
 34
 Computer III anticipated that advances in technology would make it possible to achieve what was termed complete "unbundling" of service components into "building blocks" that would permit the enhanced service providers to construct their own innovative services as easily as the BOCs. The FCC specified that all basic network capabilities that would be useful in enhanced service applications, "including signaling, switching, billing, and network management" would be subject to the unbundling requirement. Id. at 1040. The FCC observed that "[s]uch unbundling is essential to give competing enhanced services providers an opportunity to design offerings that utilize network services in a flexible and economical manner. In essence, competitors will pay only for those Basic Service Elements that they use in providing enhanced services." Id. at 1064. This unbundling was intended to permit BOCs' enhanced service competitors to purchase only those elements necessary to a specific type of enhanced service. The network was to be open in order to prevent the BOCs from limiting access, and the unbundled elements were to be tariffed in order to prevent overcharges. See California II, 4 F.3d at 1509.
 
 
 35
 As an interim measure, Computer III required the BOCs to establish "comparably efficient interconnection" (CEI) plans so that the BOCs could provide integrated enhanced services pending the unbundling of the networks. The BOCs had to file CEI plans for each enhanced service the BOCs offered. The CEI plans ensured that enhanced service competitors were provided with interconnections to the BOCs' own networks that were substantially equivalent to the interconnections that the BOCs provided for their own enhanced services. CEI, in contrast to ONA, was limited to offering the competitors only the interconnections for enhanced services that the BOCs themselves already offered. CEI does not allow competitors to pick and choose building blocks to create their own enhanced services. See California II, 4 F.3d at 1511.
 
 
 36
 In California I we accepted the FCC's assessment that, because of ONA, structural separation was no longer required to prevent access discrimination. We observed that the network access policies that the FCC planned to substitute for structural separation depended on the development of new technologies.
 
 
 37
 The FCC's policy of Comparably Efficient Interconnection (CEI) is designed to ensure that each BOC will provide competitors with connections to the local exchange that equal the connections available to the BOCs' own enhanced services offerings. Moreover, the Open Network Architecture (ONA) policy requires each BOC to incorporate CEI concepts into the overall design of its basic service network. Thus, the record supports the Commission's finding that technologies for ensuring equal access have improved, and may be effective in preventing discrimination in ways not feasible in the past.
 
 
 38
 California I, 905 F.2d at 1233.
 
 
 39
 The BOCs were required to file open network architecture plans by 1988; approval of such plans was a precondition to the removal of structural separation. As the FCC said in Computer III:
 
 
 40
 After implementation of an approved Open Network Architecture Plan and the carrier's satisfaction of our cost allocation and other safeguards, the structural separation requirements will no longer apply to the carrier's enhanced services operations, and it will not be required to file a service-specific CEI plan prior to offering a new enhanced service.
 
 
 41
 Computer III, 104 F.C.C.2d at 1067-68.
 
 
 42
 Beginning in 1988, the FCC filed a series of orders reviewing the ONA plans that the BOCs submitted.[9] It is these orders implementing ONA that we reviewed in California II. We concluded that they constituted a retreat from the original promise of Computer III.
 
 
 43
 In California II we reviewed MCI's claim that, in approving the ONA plans, the FCC had significantly altered, without reasoned justification, the scope and purpose of ONA as articulated in Computer III. 4 F.3d at 1510-11. We rejected the FCC's claim that ONA had always been intended to be an evolutionary process. Id. at 1511. We agreed with MCI that because the ONA plans as approved did not accomplish fundamental unbundling, the FCC's approval of these plans constituted a change from its position that complete ONA was a prerequisite to the elimination of structural separation. We stated: "[t]he orders before us represent a change from the FCC's earlier view in Computer III that complete ONA would precede lifting structural separation. These orders advance the view that structural separation can be lifted before the implementation of a fully realized ONA." Id. at 1513. We did not, however, set aside the orders implementing ONA because those orders did not themselves lift structural separation or explain the conditions under which structural separation, after California I, could be lifted. The Order on Remand does lift structural separation, and we must consider whether it adequately explains why fully implemented ONA is no longer regarded as a necessary safeguard against access discrimination after removal of structural separation.
 
 
 44
 In a companion order to the Order on Remand, the FCC conditionally approved ONA plans filed by the BOCs.[10] In this order, as in the ONA orders reviewed in California II, the FCC reaffirmed its view that ONA will be an evolutionary process. In line with this policy shift, the approved ONA plans do not offer full deployment of ONA services and are not based on new technology. In the Order on Remand, the FCC recognized that it no longer requires fundamental unbundling of the BOC networks as a precondition to lifting structural separation. "[T]he Commission declined to require a radical reconfiguration or fundamental unbundling of the BOC networks, stating that providing ONA based on a more disaggregated and at that time unspecified architecture would be extremely costly and unnecessary for effective implementation of ONA." Order on Remand, 6 F.C.C.R. at 7600-01.
 
 
 45
 In support of its claim that the nonstructural safeguards currently regarded as adequate by the FCC will not prevent access discrimination, MCI argues that the record contains evidence of access discrimination by the BOCs in the provision of enhanced services. MCI relies heavily on the decision of the Georgia Public Service Commission (Georgia PSC) in its investigation into BellSouth's provision of MemoryCall Service. Order of the Commission, In the Matter of the Commission's Investigation into Southern Bell Telephone and Telegraph Company's Trial Provision of MemoryCall Service, Docket No. 4000-U (Ga. PSC June 4, 1991). The Georgia PSC authorized BellSouth to provide an intrastate voice-messaging system, known as MemoryCall, to limited markets on a trial basis. After conducting an investigation into the provision of MemoryCall, the Georgia PSC concluded that BellSouth had the opportunity and incentive to behave anticompetitively given its monopoly over the local exchange and had in fact discriminated against competitor enhanced service providers by giving them inferior access to the local network. The Georgia PSC found that the record demonstrated at least three significant instances of discriminatory behavior by BellSouth. The Georgia PSC found that: (1) because of technical barriers to independent enhanced service providers' use of the local networks, competitors could only provide a voice-messaging service that was significantly inferior to MemoryCall; (2) BellSouth had refused to allow competitors to co-locate their equipment in BellSouth's central offices, resulting in quality and price disadvantages for competitors; and (3) BellSouth had manipulated development of the local network, especially the timing of the unbundling of certain network features necessary for voice-messaging services, in order to maximize its competitive advantage for its initial offering of MemoryCall. Id. at 27-34.
 
 
 46
 The FCC responds that the MemoryCall case does not show that its safeguards are ineffective because, among other reasons, ONA had not yet been implemented at that time. The problem with this argument is that ONA, at least as defined in Computer III, still has not been achieved. The MemoryCall case shows that the BOCs have the incentive to discriminate and the ability to exploit their monopoly control over the local networks to frustrate regulators' attempts to prevent anticompetitive behavior. The FCC has not explained adequately how its diluted version of ONA will prevent this behavior.
 
 
 47
 The FCC contends that ONA is merely one component of its overall regulatory scheme designed to prevent access discrimination. The FCC points to the other safeguards against access discrimination it has established, including CEI, nondiscrimination reporting requirements and network disclosure rules. The FCC contends that even without fully implemented ONA, these safeguards will prevent access discrimination. The problem with this argument is that the FCC ruled to the contrary in Computer III and has not explained, in its Order on Remand or elsewhere in its formal rulings, why the conclusion it reached in Computer III regarding ONA has changed.
 
 
 48
 Under CEI, the BOCs must provide other enhanced service providers the same interconnections the BOCs use in providing their own services. The nondiscrimination reporting requirements are designed to allow the FCC to determine whether the BOCs are providing the same quality of service to competitors as used in the BOCs' own enhanced services. The network disclosure rules provide that the BOCs must give notice to competitors of new or modified network services affecting interconnection for enhanced services.
 
 
 49
 While CEI and the nondiscrimination reporting requirements are designed to prevent BOC discrimination against other enhanced service providers where a BOC is providing its own enhanced service, these safeguards do not enable enhanced service providers to pick and choose network service elements to design and develop enhanced services. Consequently, competitors who otherwise would be able to compete effectively by offering more efficient packages of services had fundamental unbundling been accomplished might be excluded from the market entirely. Further, the network disclosure rules do not guarantee that the BOCs will provide competitors with the interconnection they need for their enhanced services. Thus, according to the analysis of the FCC in Computer III, these safeguards are not a substitute for ONA and, without ONA, are not adequate to prevent access discrimination. If these conclusions no longer hold, the FCC has not explained why.
 
 
 50
 In our view, the FCC in the Order on Remand, as in its orders implementing ONA, has changed its requirements for, or definition of, ONA so that ONA no longer contemplates fundamental unbundling. Yet in Computer III the FCC regarded that fundamental unbundling as a key safeguard against access discrimination. In the Order on Remand, the FCC never explains why it now authorizes lifting structural separation when it recognizes that its assumptions in Computer III regarding ONA have not proven correct, and that fundamental unbundling is not attainable at this time. In Computer III, the FCC concluded that ONA, based on new technology to permit fundamental unbundling, would be a key nonstructural safeguard in preventing access discrimination as effectively as structural separation. Relying on this conclusion, the FCC determined that the benefit of maintaining structural separation to prevent discrimination was minimal. Now that fundamental unbundling is no longer regarded as attainable, the FCC should have adjusted its cost benefit analysis accordingly. It has not done so.
 
 
 51
 In California I, we held that because the FCC had not supported its conclusions regarding prevention of cross-subsidization, the FCC's overall cost benefit analysis was flawed and its order was arbitrary and capricious under the APA. 905 F.2d at 1238. Here, the FCC has similarly failed to provide support or explanation for some of its material conclusions regarding prevention of access discrimination. Thus, once again, we conclude that the FCC's cost benefit analysis is flawed and set aside the Order on Remand as arbitrary and capricious under the APA.
 
 Customer Proprietary Network Information
 
 52
 Collateral to its renewed attacks on the FCC's cost benefit analysis, MCI also challenges the provision in the Order on Remand that deals with Customer Proprietary Network Information (CPNI).
 
 
 53
 CPNI is information about a telephone customer's use of the telephone network, such as the number of lines ordered, service location, type and class of services purchased, usage levels, and calling patterns. This information is generated by the BOCs in their provision of basic telecommunications services. CPNI is useful to the BOCs and competitor enhanced service providers in their development and marketing of enhanced services because it can assist them in identifying potential customers, designing more efficient services, and better meeting customer needs. Customers, however, have proprietary and privacy interests in their CPNI and for this reason may seek to restrict access to their CPNI. Order on Remand, 6 F.C.C.R. at 7607, 7611.
 
 
 54
 In Computer III, the FCC adopted rules governing access to CPNI. These rules allowed the BOCs, including BOC enhanced services personnel, unrestricted access to the CPNI of BOC telephone customers unless the customer requested confidentiality. Customers, however, were not notified of their option to request confidentiality, so for the most part the BOCs had unrestricted access to CPNI by default. Independent enhanced service providers, however, were required to obtain prior authorization from customers for access to CPNI.
 
 
 55
 In the Order on Remand, the FCC strengthened the rules governing access to CPNI to protect customer confidentiality and to eliminate, in part, the BOCs' previous advantage. The FCC ordered that for customers with more than 20 lines, both the BOCs and competitors must obtain prior customer authorization for access to CPNI. For small customers, defined as those having 20 lines or less, the rules remain the same. Thus, the BOCs shall have access to CPNI of small customers unless the customer requests confidentiality, but independent enhanced service providers must obtain prior customer authorization before they can obtain CPNI for small customers.
 
 
 56
 The FCC's strengthened CPNI rules provide more competitive equity to MCI than the previous rules under Computer III, which were not challenged in California I. It is not clear why the CPNI rules are challenged for the first time in this petition. We conclude that the new CPNI rules set forth in this order are not arbitrary and capricious.
 
 
 57
 MCI challenges the new rules as irrational, largely because they are "asymmetrical." The new CPNI rules allow MCI to compete with the BOCs on an equal basis with respect to large customers, whose CPNI is more competitively valuable. At the same time, the asymmetric rule for small customers recognizes that the BOCs are uniquely situated to develop the market for small customers. The FCC found that BOC access to CPNI is justified because it allows customers the benefit of one-stop shopping which is important to the development of a mass market in enhanced services. The FCC found that the BOCs are uniquely positioned to reach small customers, and that it would be economically infeasible to develop a mass market for enhanced services if prior authorization was required for access to CPNI. If small customers are required to take an affirmative step of authorizing access to their information, they are unlikely to exercise this option and thereby impair the development of the mass market for enhanced services in the small customer market.
 
 
 58
 In adopting the new CPNI rules, the FCC balanced the competing interests of competitive equity, customer privacy, and the need for efficiency in the development of mass market enhanced services. We conclude that the FCC's balancing of these interests was not arbitrary and capricious.
 
 III. PREEMPTION
 
 59
 The Communications Act of 1934, 47 U.S.C. Secs. 151-613, separates interstate and intrastate jurisdiction to regulate telecommunications. The FCC has authority under the Act to regulate "interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, a rapid, efficient Nation-wide and world-wide wire and radio communication service." 47 U.S.C. Sec. 151. At the same time, however, the Act in Sec. 2(b)(1) denies the FCC authority over intrastate communications. That section provides in pertinent part:
 
 
 60
 [N]othing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier....
 
 
 61
 47 U.S.C. Sec. 152(b)(1).
 
 
 62
 In Computer III, the FCC issued orders preempting nearly all state regulation of enhanced services by communications common carriers, including state tariffing of enhanced services, structural separation requirements and nonstructural safeguards inconsistent with or more stringent than the FCC's nonstructural safeguards. See California I, 905 F.2d at 1239. The preemption was clearly broad enough to cover regulation of the provision of enhanced services on both an intrastate and interstate basis. Petitioners in that case contended that the preemption violated Sec. 2(b)(1) by ousting the states of jurisdiction Congress had granted them.
 
 
 63
 In California I we looked to the FCC's argument that the preemption in that case was valid because the state regulations could not feasibly coexist with the Computer III scheme. 905 F.2d at 1242-43. We agreed with the Commission that the Supreme Court's decision in Louisiana Public Service Commission v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), recognizes an "impossibility" exception to Sec. 2(b)(1). We quoted with approval the D.C. Circuit's decision in National Ass'n of Regulatory Util. Comm'rs v. FCC, 880 F.2d 422, 429 (D.C.Cir.1989), that the only limitation on a state's authority over intrastate telephone service is "when the state's exercise of that authority negates the exercise by the FCC of its own lawful authority over interstate communication." California I at 1243.
 
 
 64
 We went on to recognize, however, that the impossibility exception is narrow, and that the FCC has the burden of showing that the state regulation would negate valid FCC regulatory goals. We held that the FCC had not justified the broad preemption provisions of Computer III, and we therefore remanded. Id. at 1244.
 
 
 65
 On remand, the FCC acknowledged that "[p]reemption of state regulation in this area should be as narrow as possible to accommodate differing state views while preserving federal goals." Order on Remand, 6 F.C.C.R. at 7631. Consequently, the FCC issued a preemption order that was narrower than the order it issued in Computer III. First, with regard to structural separation, the FCC preempted only state requirements for structural separation of facilities and personnel used to provide the intrastate portion of jurisdictionally mixed enhanced services. The FCC did not preempt state regulations that require a separate corporate entity with separate books of account for provision of such services. The FCC also declined to preempt any state structural separation requirements with respect to enhanced services that are offered on a purely intrastate basis. Second, the FCC preempted state CPNI regulations that require prior authorization inconsistent with that required in the Order on Remand. Third, the FCC preempted state rules that require initial disclosure of network changes at a different time than the network disclosure rules in the Order on Remand.
 
 
 66
 In its petition for review to this court, New York's principal contention is that the FCC may preempt state action only when it is acting pursuant to specified regulatory duties under Title II of the Act, such as setting tariffs. It contends that in this case, the FCC's action is intended to implement the more general goals of Title I and hence no preemption authority exists under Louisiana.
 
 
 67
 This position must be rejected. The Supreme Court's opinion in Louisiana is not so narrowly restricted. Although the Court discussed a Title II function in the paragraph to which it appended the footnote that suggested the 'impossibility' exception, see Louisiana, 476 U.S. at 375 & n. 4, 106 S.Ct. at 1902 & n. 4, we do not ascribe any significance to this placement. The argument that the Court made with respect to Title I on the preceding page, that section 2(b) of the Act "constitutes ... a congressional denial of power to the FCC" to regulate, id. at 374, 106 S.Ct. at 1901, applied to Title II as well as Title I. We recognized in California I, moreover, that the impossibility exception applied to FCC preemption action designed to achieve the same regulatory goals it seeks to achieve here. 905 F.2d at 1243. Indeed, we noted specifically that the FCC acted pursuant to Title I of the Act. See id. at 1240-41 n. 35. The difficulty with Computer III was the FCC's failure to justify the breadth of the preemption in that order, not its jurisdiction to order any preemption.
 
 
 68
 The only remaining question, raised by California and other intervening states, is whether the FCC has indeed justified the extent of its preemption as sufficiently narrowly tailored under the impossibility exception. On remand, the FCC preempted state regulations requiring separate facilities and personnel for the intrastate portion of enhanced services that are offered both interstate and intrastate. The FCC determined that it would not be economically feasible for the BOCs to offer the interstate portion of such services on an integrated basis while maintaining separate facilities and personnel for the intrastate portion. Thus, the FCC concluded, the BOCs would opt to comply with state requirements and provide such services entirely on a structurally separated basis.
 
 
 69
 The FCC has presented adequate record support for its conclusion that because of economic and operational factors, enhanced service providers would separate their facilities for services that are offered both interstate and intrastate, thereby essentially negating the FCC's goal of allowing integrated provision of enhanced and basic services. We agree with the FCC that the situation presented here is similar to that presented in North Carolina Utils. Comm'n v. FCC, 537 F.2d 787 (4th Cir.), cert. denied, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976), and North Carolina Utils. Comm'n v. FCC, 552 F.2d 1036 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977) (the NCUC cases), which were the cases that the Louisiana Court suggested would warrant application of an impossibility exception. 476 U.S. at 375 n. 4, 106 S.Ct. at 1902 n. 4. In the NCUC cases, the Fourth Circuit upheld the FCC's preemption of state regulations barring the use of customer provided telephone equipment for intrastate service, because they conflicted with the FCC's regulations allowing customers to provide their own telephones for interstate service. The Fourth Circuit acknowledged that it was possible to comply with both the states' and the FCC's regulations: customers could have one telephone for interstate use and one for intrastate use. The court nevertheless agreed with the FCC that it was highly unlikely, due to practical and economic considerations, that customers would maintain two separate phones and, therefore, that customers would use telephone company equipment to comply with state regulations. NCUC, 552 F.2d at 1043. Because the state regulations would effectively negate the FCC's regulation authorizing the use of customer provided equipment for interstate services, the Fourth Circuit upheld the FCC's preemption. Id.
 
 
 70
 Here, as in the NCUC cases, the FCC acknowledges that the BOCs could comply with structural separation requirements, but contends that it would not be economically or operationally feasible for them to do so. The BOCs would be forced to comply with the state's more stringent requirements, or choose not to offer certain enhanced services, thereby defeating the FCC's more permissive policy of integration. We conclude that the impossibility exception, as applied in the NCUC cases, authorizes the FCC's preemption of state structural separation requirements here.
 
 
 71
 We also affirm the FCC's preemption of state regulations regarding CPNI and network disclosure rules. The FCC has shown that conflicting state rules regarding access to CPNI would negate the FCC's goal of allowing the BOCs to develop efficiently a mass market for enhanced services for small customers. The FCC has also demonstrated that compliance with conflicting state and federal network disclosure rules would in effect be impossible.
 
 
 72
 In sum, the FCC's order adequately responds to our directive that "the FCC bears the burden of justifying its entire preemption order by demonstrating that the order is narrowly tailored to preempt only such state regulations as would negate valid FCC regulatory goals." See California I, 905 F.2d at 1243. The FCC has met its burden of showing that its regulatory goals of authorizing integration of services would be negated by the state regulations it has preempted. We therefore conclude that the FCC has satisfied our concerns expressed in California I and that the preemption aspects of the Order on Remand should be upheld.
 
 IV. CONCLUSION
 
 73
 On our review of the Order on Remand, we conclude that the FCC's nonstructural safeguards against cross-subsidization adequately respond to our concerns in California I, but that the FCC has failed to explain or justify its change in policy regarding nonstructural safeguards against access discrimination. For this reason, the FCC's cost benefit analysis is flawed and that portion of its order is arbitrary and capricious. We uphold those portions of the Order on Remand that implement CPNI rules and that preempt state regulations.
 
 
 74
 WE GRANT THE PETITION FOR REVIEW, VACATE IN PART THE ORDER ON REVIEW, AND REMAND TO THE COMMISSION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
 
 
 
 [1]
 Report and Order, In re Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry), (Docket No. 85-229), 104 F.C.C.2d 958 (1986) (Computer III ), on reconsideration, 2 F.C.C.R. 3035 (1987); 2 F.C.C.R. 3072 (1987); Memorandum Opinion and Order on Further Reconsideration, In re Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry), 3 F.C.C.R. 1135 (1988); Memorandum Opinion and Order on Reconsideration, In re Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry), 3 F.C.C.R. 1150 (1988)
 
 
 [2]
 Report and Order, In the Matter of Computer III Remand Proceedings: Bell Operating Company Safeguards and Tier 1 Local Exchange Company Safeguards, CC Docket 90-623, 6 F.C.C.R. 7571 (1991)
 
 
 [3]
 Memorandum Opinion and Order, Filing and Review of Open Network Architecture Plans, Phase I, FCC 88-381, 4 F.C.C.R. 1 (1988); Memorandum Opinion and Order on Reconsideration, Filing and Review of Open Network Architecture Plans, Phase I, FCC 90-134, 5 F.C.C.R. 3084 (1990); Memorandum Opinion and Order, Filing and Review of Open Network Architecture Plans, Phase I, FCC 90-135, 5 F.C.C.R. 3103 (1990); and Report and Order, Computer III Remand Proceedings, FCC 90-415, 5 F.C.C.R. 7719 (1990)
 
 
 [4]
 Petitioners are MCI Telecommunications Corporation and Newspaper Association of America. The following parties are intervenors in support of MCI: Compuserve, Inc., Information Technology Association of America, Information Industry Association, Pennsylvania Office of Consumer Advocate, and Maryland People's Counsel
 The following parties are intervenors in support of FCC on the MCI petitions: Illinois Bell, Indiana Bell, Michigan Bell, Ohio Bell, Wisconsin Bell, Bell Atlantic, BellSouth, Pacific Bell, Nevada Bell, Southwestern Bell, U.S. West Communications, Bell Operating Companies, United States Telephone Association, and NYNEX.
 
 
 [5]
 The following parties are intervenors in support of California and New York: Florida Public Service Commission, Maryland People's Counsel, Pennsylvania Office of Consumer Advocate, Pennsylvania Public Utility Commission, and National Association of Regulatory Utility Commissioners
 The following parties are intervenors in support of FCC on the California and New York petitions: International Business Machines Corporation, American Telephone & Telegraph Company, Bell Atlantic, BellSouth, NYNEX, Pacific Bell, Nevada Bell, Southwestern Bell, U.S. West Communications, Information Industry Association, and Information Technology Association of America.
 
 
 [6]
 The history of the FCC's regulation of the enhanced services industry is set forth more fully in our opinion in California I, 905 F.2d at 1223-30
 
 
 [7]
 Final Decision, In re Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), 77 F.C.C.2d 384 (1980) (Computer II )
 
 
 [8]
 Report and Order, In re Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies, 95 F.C.C.2d 1117 (1983), aff'd sub nom. Illinois Bell Tel. Co. v. FCC, 740 F.2d 465 (7th Cir.1984)
 
 
 [9]
 See supra note 3
 
 
 [10]
 In the Matter of Filing and Review of Open Network Architecture Plans, CC Docket No. 88-2, Phase I (1991)