FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, FKA American Cable Association; CTIA – THE WIRELESS ASSOCIATION; NCTA – THE INTERNET & TELEVISION ASSOCIATION; USTELECOM – THE BROADBAND ASSOCIATION, *Plaintiffs-Appellants*, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California, *Defendant-Appellee*. | No. 21-15430 <br><br> D.C. No. 2:18-cv-02684-JAM-DB <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted September 14, 2021
San Francisco, California

Filed January 28, 2022

Before:  J. Clifford Wallace, Mary M. Schroeder, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge Schroeder;
Concurrence by Judge Wallace

## SUMMARY[*]

### Preliminary Injunction / Preemption

The panel affirmed the district court's order denying plaintiffs' motion for a preliminary injunction against enforcement of the California Internet Consumer Protection and Net Neutrality Act of 2018, or SB-822.

In a 2018 order, the Federal Communications Commission decided to stop treating broadband internet services as "telecommunications services" subject to relatively comprehensive, common-carrier regulation pursuant to Title II of the Communications Act, and to classify them instead under Title I as lightly regulated "information services," which had the result of terminating federal net neutrality rules. A group of industry trade associations representing communications service providers sought an injunction to prevent the California Attorney General from enforcing SB-822, which in essence, codified the rescinded federal net neutrality rules, but limited its application to broadband internet services provided to customers in California. The district court concluded there

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

was no federal preemption because the FCC lacked the requisite regulatory authority.

In *Mozilla Corp. v. F.C.C.*, 940 F.3d 1 (D.C. Cir. 2019), the D.C. Circuit upheld the FCC's 2018 reclassification decision but struck down an accompanying order preempting state net neutrality rules. The panel rejected the service providers' contention that SB-822 nevertheless was preempted because it conflicted with the policy underlying the FCC's reclassification decision and conflicted with the Communications Act and its limitations on federal regulation. The panel also rejected the service providers' contention that SB-822 was preempted because federal law occupies the field of interstate services.

Guided by the D.C. Circuit's decision in *Mozilla*, the panel held that only the invocation of federal regulatory authority can preempt state regulatory authority. The panel held that, by classifying broadband internet services as information services, the FCC no longer had the authority to regulate in the same manner that it did when these services were classified as telecommunications services. The FCC, therefore, could not preempt state action, like SB-822, that protects net neutrality. The panel held that SB-822 did not conflict with the Communications Act itself, which only limits the FCC's regulatory authority. The panel held that the service providers' field preemption argument was foreclosed by case law and various provisions of the Communications Act.

Concurring, Judge Wallace wrote separately to express his concern that in some cases, parties appeal orders granting or denying motions for preliminary injunctions in the misguided belief they can ascertain the views of the appellate

court on the merits of the litigation, and this often leads to unnecessary cost, delay and inefficient use of judicial resources.

**COUNSEL**

Scott H. Angstreich (argued), Leslie V. Pope, and Alex A. Parkinson, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C., for Plaintiffs-Appellants CTIA – The Wireless Association and USTelecom – The Broadband Association.

Matthew A. Brill, James Tomberlin, Matthew T. Murchison, and Ryan S. Baasch, Latham & Watkins LLP, Washington, D.C., for Plaintiff-Appellant NCTA – The Internet & Television Association.

Jeffrey A. Lamken, MoloLamken LLP, Washington, D.C., for Plaintiff-Appellant ACA Connects – America's Communications Association.

P. Patty Li (argued), Sarah E. Kurtz, and John D. Echeverria, Deputy Attorneys General; Paul Stein and Heather B. Hoesterey, Supervising Deputy Attorneys General; Joshua Patashnik, Deputy Solicitor General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General; Attorney General's Office, San Francisco, California; for Defendant-Appellee.

Corbin K. Barthold, Berin Szóka, and James Dunstan, TechFreedom, Washington, D.C., for Amicus Curiae TechFreedom.

Jeffrey M. Harris, Bryan Weir, and Tiffany H. Bates, Consovoy McCarthy PLLC, Arlington, Virginia; Tara S. Morrissey and Paul V. Lettow, U.S Chamber Litigation Center; for Amici Curiae Chamber of Commerce of the United States of America, California Chamber of Commerce, Small Business & Entrepreneurship Council, Telecommunications Industry Association, and CALinnovates.

Brian R. Hardy and Kathleen A. Wilde, Marquis Aurbach Coffing, Las Vegas, Nevada, for Amicus Curiae International Center for Law & Economics.

Christopher S. Yoo, University of Pennsylvania Carey Law School Transnational Legal Clinic, Philadelphia, Pennsylvania, pro se Amicus Curiae.

Kevin K. Russell, Goldstein & Russell PC, Bethesda, Maryland, for Amici Curiae Professors of Communications Law, and Media Democracy Fund.

Corynne McSherry and Kit Walsh, Electronic Frontier Foundation, San Francisco, California; Jacob A. Snow, ACLU Foundation of Northern California, San Francisco, California; Melissa Goodman and Zoe McKinney, ACLU Foundation of Southern California, Los Angeles, California; Andrew Jay Schwartzman, Benton Institute for Broadband & Society, Washington, D.C.; for Amici Curiae Electronic Frontier Foundation, ACLU Foundation of Northern California, ACLU Foundation of Southern California, Access Humboldt, Benton Institute for Broadband & Society, Clean Money Campaign, Fight for the Future, Greenling Institute, iFixit Inc., Media Justice, National Hispanic Media Coalition,

Oakland Privacy, Reddit Inc., Turn—The Utility Reform Network, and Writers Guild of America, West, Inc.

Letitia James, Attorney General; Barbara D. Underwood, Solicitor General; Steven C. Wu, Deputy Solicitor General; Office of the Attorney General, New York, New York; William Tong, Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General, Wilmington, Delaware; Clare E. Connors, Attorney General, Honolulu, Hawai'i; Kwame Raoul, Attorney General, Chicago, Illinois; Aaron M. Frey, Attorney General, Augusta, Maine; Brian E. Frosh, Attorney General, Baltimore, Maryland; Maura Healey, Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General, Lansing, Michigan; Keith Ellison, Attorney General, Saint Paul, Minnesota; Gurbir S. Grewal, Attorney General, Trenton, New Jersey; Hector Balderas, Attorney General, Santa Fe, New Mexico; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Josh Shapiro, Attorney General, Harrisburg, Pennsylvania; Peter F. Neronha, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General, Montpelier, Vermont; Robert W. Ferguson, Attorney General, Olympia, Washington; Joshua Kaul, Attorney General, Madison, Wisconsin; Karl A. Racine, Attorney General, Washington, D.C.; for Amici Curiae States of New York, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Wisconsin, and District of Columbia.

James R. Williams, County Counsel; Greta S. Hansen, Chief Assistant County Counsel; Raphael N. Rajendra and Meredith A. Johnson, Deputy County Counsel; Office of the County Counsel, San Jose, California; for Amici Curiae County of Santa Clara and Six Additional Local Governments.

Phillip R. Malone, Juelsgaard Intellectual Property and Innovation Clinic, Mills Legal Clinic at Stanford Law School, Stanford, California; Michael J. Burstein, New York, New York; for Amici Curiae Internet Law Professors.

Thomas H. Vidal, Pryor Cashman LLP, Los Angeles, California, for Amici Curiae Access Now, Mozilla Corp., Public Knowledge, New America's Open Technology Institute, and Free Press.

## OPINION

SCHROEDER, Circuit Judge:

### Overview

For the broadband internet industry, the critical regulatory issues that have emerged so far in this century concern access to the internet: what entities have access, on what terms, and to what extent access should be regulated. The administrative enthusiasm of the Federal Communications Commission ("FCC") has seemingly ebbed and flowed with the political tides, culminating most recently in its 2018 decision to stop treating broadband services as "telecommunications services" subject to relatively comprehensive, common-carrier regulation pursuant to Title II of the Communications Act, and to classify them instead under Title I as lightly regulated "information services." *In the Matter of Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018) ("2018 Order").

This 2018 Order had the significant result of terminating federal regulation intended to protect equal access to the internet, popularly known as "net neutrality" rules. This in

turn has raised immediate questions about the extent of states' authority in the field. In this appeal, we consider the broadband industry's contention that, when the FCC reclassified broadband services under Title I, thereby abandoning its regulatory authority with respect to net neutrality, California was preempted from stepping into the breach to enact its own net neutrality protections.

Plaintiffs-Appellants are a group of industry trade associations representing communications service providers ("service providers") who sought an injunction to prevent the California Attorney General from enforcing the California Internet Consumer Protection and Net Neutrality Act of 2018 ("SB-822"). Cal. Stats. 2018, ch. 976. This state law, in essence, codified the rescinded federal net neutrality rules, but limits its application to broadband internet services provided to customers in California. The district court ruled in favor of California and denied the service providers' request for a preliminary injunction to block enforcement of the statute. The district court concluded there was no preemption because the FCC lacked the requisite regulatory authority.

The district court's decision was in line with the D.C. Circuit's recent holding in *Mozilla Corp. v. F.C.C.*, 940 F.3d 1 (D.C. Cir. 2019) ("*Mozilla*"). The court in *Mozilla* reviewed the validity of the FCC's 2018 reclassification decision and an accompanying order preempting state net neutrality rules. The court upheld the reclassification, but struck down the preemption order. *Id.* at 18. The critical issue with respect to preemption was whether the FCC retained the statutory authority to adopt federal net neutrality rules after its decision to reclassify broadband internet services under Title I of the Communications Act. The D.C.

Circuit held that, under Title I, the FCC did not have the authority to regulate broadband services in this manner, and because federal regulatory authority is a prerequisite to preemption, the FCC could not expressly preempt the states. *See id*. at 74–76.

The service providers here nevertheless contend that the California statute is preempted on the basis of both conflict and field preemption. They argue first that SB-822 is preempted because it conflicts with the policy underlying the FCC's reclassification decision; that policy was to eliminate all net neutrality regulation of broadband services, not to replace federal regulations with what could become a checkerboard of state regulations. The service providers additionally contend that SB-822 is preempted because it conflicts with the Communications Act itself and its limitations on federal regulation. They argue as well that even if there is no preemption by virtue of any identifiable conflict, federal law occupies the field of interstate services and therefore preempts state laws regulating intrastate services that intrude upon the field of interstate services.

We conclude the district court correctly denied the preliminary injunction. This is because only the invocation of federal regulatory authority can preempt state regulatory authority. As the D.C. Circuit held in *Mozilla*, by classifying broadband internet services as information services, the FCC no longer has the authority to regulate in the same manner that it had when these services were classified as telecommunications services. *See id*. at 75–76. The agency, therefore, cannot preempt state action, like SB-822, that protects net neutrality. *See id*. at 18. Without the authority to preempt, it does not much matter whether SB-822 conflicts with the federal policy objectives underlying the

reclassification decision.  And SB-822 does not conflict with the Communications Act itself, which only limits the FCC's regulatory authority.  As to the service providers' field preemption argument, Supreme Court authority, the case law of this circuit, and various provisions of the Communications Act itself all foreclose that argument.

The stakes in this case are high for the industry and consumers.  We have been aided in our study of the issues with briefs submitted by a multitude of amici curiae, including state and local governments, trade associations, advocacy groups, and law professors.  In order to adequately explain the background of this case and the legal issues before us, we first provide a brief introduction to the concept of net neutrality and the recent history of FCC regulations pertaining to it.

## An Introduction to Net Neutrality

At its most fundamental level, the internet is a global network of interconnected cables providing the physical infrastructure that connects computers.  Data travels along these cables from the computer seeking information to the computer that houses the information and back.  To be considered broadband internet, data must download to a consumer's device at relatively high speeds.  *See, e.g.*, Chris Woodford, *The Internet*, EXPLAINTHATSTUFF! (July 6, 2021), https://www.explainthatstuff.com/internet.html;    Dave Johnson, *A Beginner's Guide to Broadband Internet, the Most Popular Type of Internet in the US*, INSIDER (April 2, 2021), https://www.businessinsider.com/what-is-broadband-internet.

Many of the plaintiffs-appellants in this case are broadband internet service providers, operating the cables that

take information from the global cable networks to the relevant computer. If the cables forming the internet were a highway, data would be the cars driving along that highway, and the internet service providers would build and maintain the exit ramps from the highway to consumers' homes and businesses. Accordingly, consumers must subscribe to a broadband internet service provider in order to connect to high-speed internet.

These broadband internet service providers control access to the internet. They can do so on the basis of the content of the information or the identity of the information's creator. This power of control has revenue creating potential. Providers have exercised that power in different ways, such as by blocking access altogether, slowing certain customer's access to the internet—commonly termed "throttling"—or prioritizing access to some content over others. The power to control access can therefore open the door for anti-competitive, discriminatory behavior that could disadvantage important segments of society. For illustration, the FCC has found that service providers engage in anti-competitive behavior when they block access to services that compete with their own. *See, e.g.*, *Madison River Communications, LLC, Consent Decree*, 20 FCC Rcd. 4295 (2005) (finding that a service provider blocked ports on its network that were used by competing services, resulting in a consent decree and fine).

Any federal authority to regulate the exercise of that control and safeguard equal access to the internet rests with the FCC. That agency regulates broadband internet services under the Communications Act, 47 U.S.C. § 151 *et seq*, and the amendments to the Act made by the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. Under the

Communications Act, the FCC has the authority to classify broadband internet services as either a "telecommunications service" under Title II of the Act, 47 U.S.C. §§ 201–222, or an "information service" under Title I, 47 U.S.C. §§ 151–155.

The classification decision is key because it dictates the scope of the FCC's regulatory authority. The FCC has express, expansive authority to regulate Title II telecommunications services, but only a more limited "ancillary authority" with respect to Title I information services. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 975–76 (2005) ("*Brand X*"). Pursuant to Title I, the FCC can only impose regulations ancillary or necessary to the effective performance of the FCC's specific statutory responsibilities. *See id.*; *see also People of State of California v. F.C.C.*, 905 F.2d 1217, 1240 n.35 (9th Cir. 1990) ("*California I*"); 47 U.S.C. §§ 151–155. If classified under the broad authority of Title II, telecommunications services are treated as common carriers, which triggers a multitude of statutory restrictions and requirements. *Brand X*, 545 U.S. at 975–76; *California I*, 905 F.2d at 1240 n.35; 47 U.S.C. §§ 201–222.

Under Title II, the FCC can regulate broadband internet services to ensure what has come to be known as "net neutrality," by adopting regulations making it illegal for service providers to engage in blocking, throttling, and prioritization for payment or to benefit an affiliate. *See U.S. Telecom Ass'n v. F.C.C.*, 825 F.3d 674, 689 (D.C. Cir. 2016) (upholding *In the Matter of Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015) ("2015 Order")). Such regulation imposes costs that critics have argued would threaten to stifle investment and innovation, 2018 Order ¶¶ 2, 4, and which supporters have contended are required to

ensure open internet access along with broadband investment and deployment, 2015 Order, ¶¶ 8, 11.

The upshot of the controversy is that net neutrality rules have had an off-again, on-again history. Prior to 2015, the FCC classified broadband internet as an information service under Title I, and the agency's efforts to impose net neutrality rules were repeatedly struck down as outside the regulatory authority of that Title. *See, e.g.*, *Comcast Corp. v. F.C.C.*, 600 F.3d 642, 644 (D.C. Cir. 2010); *Verizon v. F.C.C.*, 740 F.3d 623, 628 (D.C. Cir. 2014). In 2015, the FCC reclassified broadband as a Title II, telecommunications service and adopted net neutrality rules which the D.C. Circuit upheld. *U.S. Telecom Ass'n*, 825 F.3d at 689, 733.

Six months after that decision, however, a new administration took office and brought with it different attitudes towards net neutrality. In 2018, the FCC reverted to the Title I classification and rescinded the net neutrality rules, a decision that ultimately gave rise to this litigation. 2018 Order ¶¶ 2, 4, 65. The FCC reasoned that the net neutrality rules were too expensive and that the costs of the rules outweighed their benefits. *Id.* at ¶¶ 2, 4. Instead, the FCC adopted a "Transparency Rule" calling for broadband service providers to disclose practices that block, throttle, or prioritize internet traffic for payment or to benefit an affiliate. *See* 2018 Order ¶¶ 3, 215–231. These actions benefitted internet service providers, at least in part because the Transparency Rule lowered their compliance costs. *See, e.g.*, David Shepardson, *U.S. Defends FCC's Repeal of Net Neutrality Rules*, Reuters, Oct. 12, 2018.

At the same time, in an effort to preclude state action, the FCC announced a "Preemption Directive," which purported

to preempt "any state or local requirements that are inconsistent with the federal deregulatory approach," 2018 Order ¶ 194, including "any state or local measures that would effectively impose rules or requirements that [the Order] repealed," 2018 Order ¶ 195. The Preemption Directive also benefitted the service providers because it was aimed at preventing state regulations that would impose additional compliance costs.

In *Mozilla*, various states and consumer groups challenged the Reclassification Order and accompanying Preemption Directive. The D.C. Circuit upheld the reclassification, considering itself bound by the Supreme Court's decision in *Brand X*, 545 U.S. at 19. *Mozilla*, 940 F.3d. at 18–19. Because the Supreme Court had made it clear in *Brand X* that the Communications Act affords the FCC the discretion to classify broadband services, the D.C. Circuit upheld the classification under Title I as reasonable. *See id.* at 18–20, 87.

Two judges in *Mozilla* nevertheless expressed considerable reservations about their holding, because the nature of broadband services had changed substantially since *Brand X* was decided. *See id.* at 18–20; *see also id*. at 86–87 (Millett, J. concurring); *Id.* at 94–95 (Wilkins, J. concurring). Judge Millett explained in her concurrence that, at the time *Brand X* was decided, consumers used service providers chiefly to gain access to information services like domain name services and caching. *See id.* at 87. Today, these information services no longer occupy the same significance that they once did. *See id.* While the judges felt their hands were tied by *Brand X*, they suggested that it is no longer accurate to rely on domain name services and caching to

determine the legal status of broadband services. *See id*. at 88–90, 94–95.

Although it upheld the reclassification to Title I, the court in *Mozilla* vacated the Preemption Directive. *Id.* at 74. The court explained that the FCC may only preempt state law, as the Preemption Directive purported to do, if the agency is acting within the scope of its congressionally delegated authority to regulate. *Id.* at 74–75 (citing *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("*Louisiana*")). By reclassifying broadband as a Title I information service, the FCC stripped itself of the requisite regulatory authority and, accordingly, of the preemptive authority to displace state laws. *See id.* at 74–76.

## Background of this Litigation

In the immediate wake of the FCC's 2018 decision, but before the D.C. Circuit's *Mozilla* decision, California adopted SB-822. This state law does what the Preemption Directive was intended to prevent: it essentially codifies the FCC's 2015 net neutrality rules, *Compare* Cal. Civ. Code § 3101(a)(1)–(2), (4), (7)(A) *with* 2015 Order ¶¶ 15–16, 18, 21, although it applies only to broadband internet services provided to customers in California. Cal. Civ. Code § 3100(b), (k). Additionally, SB-822 contains a disclosure measure similar to the FCC's 2018 Transparency Rule. *Compare* Cal. Civ. Code § 3101(a)(8) *with* 47 C.F.R. § 8.1(a).

California was one of the many plaintiffs in the *Mozilla* litigation challenging the FCC's 2018 decision. *See Mozilla*, 940 F.3d at 13, 17. Before the D.C. Circuit could decide that case, the service providers filed this action in the District Court for the Eastern District of California, challenging SB-

822. They requested declaratory and injunctive relief, including a preliminary injunction preventing California from enforcing SB-822. The United States filed a separate action alleging similar claims. The two cases were later combined. By agreement of the parties, this litigation was stayed during the pendency of *Mozilla*.

In 2019, the D.C. Circuit issued its opinion in *Mozilla* vacating the Preemption Directive. *See Mozilla*, 940 F.3d at 74–76. The D.C. Circuit held that the FCC could not preempt the states from regulating broadband services because, after reclassification, the FCC did not have the underlying authority to regulate broadband, and therefore could not preempt states from doing so. *See id*. at 18, 74–76. The *Mozilla* decision is important to our decision here. Not only did the parties agree to stay this case while *Mozilla* was pending, but none of the parties now challenge the correctness or finality of the D.C. Circuit's opinion. Following the conclusion of the *Mozilla* litigation in October 2019, and after the 2020 election resulted in a new administration, the United States withdrew as a plaintiff in this case.

After hearing extensive argument on the effect of the *Mozilla* decision, the district court, in a ruling from the bench, denied a preliminary injunction to block enforcement of the California statute. The court explained its decision with reasoning similar to that underlying the D.C. Circuit's decision in *Mozilla* which had vacated the Preemption Directive. The district court held that the FCC, after the reclassification decision, lacked the regulatory authority to preempt SB-822.

This appeal followed. To succeed in obtaining a preliminary injunction, the service providers must establish that they are likely to succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary relief, the balance of the equities supports the motion for a preliminary injunction, and an injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter v. N.R.D.C., Inc.*, 555 U.S. 7, 20 (2008). If the service providers fail to demonstrate that they are likely to succeed on the merits, this court need not consider the remaining factors. *See DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776–77 (9th Cir. 2011).

On the merits, the service providers do not dispute that, under Title I, the FCC now lacks the regulatory authority to promulgate net neutrality rules. Their principal contentions are that the California statute is nevertheless preempted because it conflicts with both the purpose underlying the FCC's reclassification decision and with the Communications Act itself. They also argue that the FCC occupies the entire field of interstate communications services to the exclusion of the states. We are guided by the D.C. Circuit's decision in *Mozilla* as to the scope of the FCC's regulatory and preemptive authority after the 2018 reclassification.

## I. The California Statute Does Not Conflict With the FCC's Reclassification of Broadband Services Under Title I

Resolution of the question of conflict preemption in this case involves a straightforward application of federal preemption principles. The service providers argue that the FCC's 2018 reclassification of broadband services as Title I information services, which eliminated the federal net

neutrality rules promulgated under Title II, preempts state net neutrality rules.  They essentially contend that the state regulation conflicts with the absence of federal regulation.  A fundamental principle of preemption, however, is that an absence of federal regulation may preempt state law only if the federal agency has the statutory authority to regulate in the first place.  *Louisiana*, 476 U.S. at 374.  The D.C. Circuit applied this principle when it vacated the FCC's Preemption Directive, as it recognized that the FCC does not have the authority to adopt federal net neutrality rules and is therefore unable to preempt such state regulation.  *See Mozilla*, 940 F.3d at 74–76.  Neither party challenges the validity or finality of *Mozilla*, so we look to the D.C. Circuit's analysis to guide our own.

Underlying the *Mozilla* decision are principles laid down by the Supreme Court relating to an agency's regulatory and preemptive authority.  When a federal agency pursues a policy of non-regulation, as the FCC was doing in its 2018 Order, the Supreme Court has recognized that the agency can preempt the states from exercising regulatory authority only when the agency has chosen not to exercise its full authority. *See Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178 (1978).

In *Ray*, Congress had granted the Secretary of Transportation broad authority to regulate the "vessel size and speed limitations" of tankers traveling in Puget Sound.  *Id*. at 174.  The Secretary chose not to ban large tankers although it had the authority to do so.  *Id.* at 174–75.  The Supreme Court held that, because the Secretary had the authority to ban large tankers, its decision not to implement such a ban preempted the states from doing so.  *Id.* at 178.

The service providers in this case urge us to rely on *Ray*. What happened in *Ray*, however, is not what happened here. By reclassifying broadband services under Title I, the FCC gave up its authority to regulate broadband services as common carriers and hence surrendered the authority it had to adopt federal net neutrality rules.

This case is thus more like the situation in *Louisiana* where the Court held that a federal agency may not preempt state regulation when the agency itself does not have regulatory authority. *See* 476 U.S. at 374. At issue in *Louisiana* was whether state regulation of intrastate depreciation rates was preempted where Congress had not given the federal agency authority to regulate those rates. *See id*. at 358–59. The FCC in *Louisiana*, to further its national policy of increasing competition in the telephone services industry, attempted to preempt state regulators who refused to accept this national policy. *Id*. Accordingly, the FCC issued two orders that changed depreciation practices affecting telephone company facilities, asserting that these orders would preclude state regulators from using their own depreciation procedures for intrastate rate-making purposes. *Id.* at 360–62. But the Supreme Court explained that the Communications Act expressly denies the FCC the power to preempt state regulation of intrastate rates. *Id.* at 373. Accordingly, the Supreme Court held that the FCC could not preempt state regulation. *See id.* at 374–75. Without the power to act, a federal agency can not preempt. *Id.* at 374. We conclude that principle applies here. The FCC can not preempt SB-822 because it gave up its full regulatory authority by reclassifying broadband as a Title I information service.

This is in accord with the D.C. Circuit's decision in *Mozilla*. It followed the principles articulated in *Ray* and *Louisiana* when it vacated the FCC's "Preemption Directive" that accompanied the "Reclassification Order." The Preemption Directive had declared as preempted "any state or local requirements that are inconsistent with [the Order's] deregulatory approach," 2018 Order ¶ 194, including "any state or local measures that would effectively impose rules or requirements that [the Reclassification Order] repealed," 2018 Order ¶ 195. But unlike the situation in *Ray* where the federal agency retained its regulatory authority and the state was preempted, 435 U.S. at 178, the Preemption Directive did not rest on any regulatory authority. By reclassifying broadband as an information service, the FCC surrendered its authority to regulate with respect to net neutrality. And just as in *Louisiana*, where a federal agency was unable to preempt state law without the authority to regulate, 476 U.S. at 374–75, the Preemption Directive exceeded the FCC's Title I statutory authority to regulate broadband and, therefore, exceeded its authority to preempt state regulation. *See Mozilla*, 940 F.3d at 74–76.

The service providers try to avoid the effect of reclassification to Title I by arguing that the decision was not an abdication of authority but an exercise of discretion under the statute as to the appropriate classification of communications services. The service providers are correct that the 2018 decision was an exercise of statutory authority to make a classification decision, but they fail to acknowledge that the effect of that decision was to eliminate the agency's authority to impose net neutrality rules.

Indeed, the FCC itself has acknowledged that it did away with the statutory authority to adopt net neutrality rules when

it reclassified broadband internet services as information services under Title I.  It said as much in the Reclassification Order.  *See, e.g.*, 2018 Order ¶ 267 (finding after reclassification no "source[] of statutory authority that individually or in the aggregate" supports net neutrality conduct rules).  This conclusion had experience behind it.  The FCC tried unsuccessfully to adopt net neutrality rules under Title I several times in the early 2000s and was unable to do so until broadband services were reclassified as a telecommunications service under Title II in 2015.  *See U.S. Telecom Ass'n*, 825 F.3d at 689.  The FCC knew that its reclassification decision in 2018 stripped the FCC of its authority to adopt federal net neutrality rules, and the D.C. Circuit held it also stripped it of its power to preempt.  *See Mozilla*, 940 F.3d at 74–76; *see also Louisiana*, 476 U.S. at 374–75.  Accordingly, there can be no preemption of the California statute as a result of the Reclassification Order.

The service providers point instead to the reasons for the reclassification to contend that the FCC's policy goals underlying the reclassification decision have preemptive effect.  They point out that the FCC made the reclassification decision in reliance on its policy judgment that a light-touch regulatory framework would be most effective.  They contend that, because the D.C. Circuit upheld these policy-based grounds for the FCC's decision, the FCC's policy behind the decision forms a valid predicate for conflict preemption.

Yet the Supreme Court has expressly rejected the argument that an agency's policy preferences can preempt state action in the absence of federal statutory regulatory authority.  *See Louisiana*, 476 U.S. at 374–75.  The Supreme Court warned that to permit preemption on the basis of policy rather than legislation would allow a federal agency to confer

power upon itself and override the power of Congress. *Id.*
As the Supreme Court said, "[t]his we are both unwilling and
unable to do." *Id.* at 375.

The service providers also suggest that the FCC's policy
choice should have preemptive effect by way of a novel
interpretation of *Chevron U.S.A., Inc. v. N.R.D.C.*, 467 U.S.
837 (1984) ("*Chevron*"). *Chevron* lays out a two-step
analysis to decide when courts should defer to an agency's
interpretation of a statute. *Id.* at 842–43. The first step is to
determine whether a statute is ambiguous. *Id.* If the court
finds any ambiguity, the court presumes that Congress
intended to delegate to the agency the authority to resolve the
ambiguity, relying on its expert policy judgment. *Id.* at
842–44. In the second step, the court determines if the
agency has chosen a reasonable interpretation. *Id.*

The service providers point to the premise of *Chevron*—
that Congress delegated to agencies the authority to interpret
ambiguous statutory language through the exercise of
agencies' reasoned policy judgment—to argue that the FCC's
deregulatory policy preferences are somehow binding on the
states.

The D.C. Circuit, however, strenuously rejected this
attempt to turn the authority to make statutory choices under
*Chevron* into an engine for preemption. *See Mozilla*,
940 F.3d at 82–85. The court explained that the discretion to
classify a communications service under federal law does not
permit the FCC to impose upon the states the policy
preferences underlying that definitional choice. *See id.* As
the D.C. Circuit explained,

> [This] theory of *Chevron* preemption, in other words, takes the discretion to decide which definition best fits a real-world communications service and attempts to turn that subsidiary judgment into a license to reorder the entire statutory scheme to enforce an overarching "nationwide regime" that enforces the policy preference underlying the definitional choice. Nothing in *Chevron* goes that far.

*Id.* at 84 (internal citations omitted). Therefore, notwithstanding the FCC's power under *Chevron* to take into account policy judgments about the benefits of a "light-touch" regulatory approach when making the decision to classify broadband services under Title I, such policy preferences are not a source of the statutory authority required to regulate or to preempt. *See id*. at 82–85. As the D.C. Circuit said, "[n]o matter how desirous of protecting their policy judgments, agency officials cannot invest themselves with power that Congress has not conferred. And nothing in *Chevron* rewrites or erases plain statutory text." *Id.* at 83 (internal citations omitted).

In spite of the D.C. Circuit's conclusion, the service providers go on to contend that this court has already decided the preemption issue in its favor. They point to our decision in *People of State of California v. F.C.C.*, 39 F.3d 919, 931–32 (9th Cir. 1994) ("*California*"), where we recognized some limited preemptive authority under Title I when state regulation would make it impossible for federal regulatory measures to take effect. That principle is not applicable here, because the FCC has adopted no relevant regulatory measures.

*California* arose at a time of unusual regulatory activity that preceded the advent of the internet and followed the break-up of AT&T. The break-up resulted in the creation of Regional Bell Operating Companies (BOCs) that could participate in the growing industry providing information services over telephone lines. *Id*. at 923–24. To prevent the BOCs from having a competitive advantage as a result of their control of these lines, the FCC had originally ordered the BOCs to structurally separate their telephone operations from the related services. *Id.* In 1986, however, the FCC determined that actual structural separation was not necessary and that less stringent, and less costly, measures could serve the same purpose. *Id.* at 924. When it eliminated the structural separation requirements and substituted less stringent measures, it also entered an order preempting any state from imposing more stringent measures, as, for example, structural separation. *Id.* at 931.

States, not surprisingly, challenged the preemption order, contending that the FCC, per the Supreme Court's decision in *Louisiana*, had no preemptive authority when acting pursuant to Title I. *Id.* at 932. We held that our own decisions had recognized an "impossibility" exception to allow the FCC to preempt state measures that would be inconsistent with lawful federal regulation. *Id.* at 931. Since the federal regulation allowed the enhanced services to be provided on an integrated basis, but BOC's compliance with state regulations could result in structural separation, we upheld the limited preemptive order. *Id.* at 932–33. The situation was very similar to that in *Ray*, where the exercise of federal regulatory authority preempted inconsistent state measures. *Ray*, 435 U.S. at 178.

In this case, of course, the FCC has not adopted any regulatory measures.  It has instead diminished its authority to regulate by its reclassification of the service providers to a relatively unregulated category under the Communications Act.  There is thus no conflict between the state's enactment of SB-822 and the FCC's order.  *California* is therefore in line with *Ray*, *Mozilla*, and our decision today.  Without the underlying authority to regulate net neutrality under Title I, the FCC is without the authority to preempt California from doing so.  *See Louisiana*, 476 U.S. at 374–75.

In a similar vein, we reject the service providers' argument about the FCC's disclosure requirements.  The Reclassification Order was accompanied by disclosure requirements, known as a Transparency Rule.  This Transparency Rule requires broadband providers to disclose practices that, for payment or to benefit an affiliate, block, throttle, or prioritize internet traffic. 2018 Order ¶¶  3, 215.  The service providers argue that because the D.C. Circuit upheld these disclosure requirements, they foreclose any other regulation of broadband services.

But the D.C. Circuit did not hold that the Transparency Rule had any effect on the states' ability to regulate net neutrality.  *Mozilla* upheld the FCC's determination that a disclosure-based regime—without net neutrality rules—provided consumer protection.  940 F.3d at 46–49.  The *Mozilla* court did not hold, however, that the FCC's decision displaced all state regulatory authority that went beyond the federal disclosure requirements.  It construed the FCC's Title I preemption authority narrowly.  *See id*. at 75–76, 82–85. The legal effect of the reclassification, and the adoption of the Transparency Rule, was to diminish federal regulatory authority.  As a result, despite the FCC's policy

preference for a lightly-regulated broadband marketplace, the agency no longer had the requisite authority to adopt federal net neutrality rules and could not preempt states from adopting them. *See id*.

The district court correctly decided that the service providers are unlikely to succeed on the merits of their claim that SB-822 conflicts with the FCC's 2018 Order.

## II. There Is No Conflict Between the California Statute and the Communications Act

The service providers' alternative position relates to the Communications Act itself. They contend that the California statute conflicts with the text of two provisions of the Communications Act. 47 U.S.C. §§ 153(51), 332(c)(2). According to the service providers, these provisions limit the states' ability to regulate broadband services. The provisions, however, do not support this theory.

Section 153(51) is located in the Communication Act's lengthy list of definitions. This section defines a "telecommunications carrier" and it further provides that a "telecommunications carrier shall be treated as a common carrier *under this chapter* only to the extent that it is engaged in providing telecommunications services." 47 U.S.C. § 153(51) (emphasis added).

Section 332 pertains to mobile broadband, which is the high-speed internet access delivered to cell phones and other mobile devices. For mobile broadband, there is a dual classification system that is similar to the classification system for telecommunications and information services. A "commercial mobile service" is subject to common carrier

status and a "private mobile service" is not.  47 U.S.C. §§ 332(c)(1)–(2).  Section 332(c)(2), defines "private mobile services," stating in relevant part that "[a] person engaged in the provision of a service that is a private mobile service shall not, insofar as that person is so engaged, be treated as a common carrier for any purpose *under this chapter*." 47 U.S.C. § 332(c)(2) (emphasis added).

The service providers urge that Sections 153(51) and 332(c)(2)  mean that states may not subject information services and private mobile services to any type of regulation that, under federal law, could be imposed only on common-carriers. They contend that these provisions limiting the FCC's regulatory authority also limits the states' authority. They do not.

The text of each provision defines and limits only the FCC's regulatory authority and makes no mention of the states' authority to regulate. 47 U.S.C. §§ 153(51), 332(c)(2). The provisions explicitly state that they are defining the extent of FCC regulation under "this chapter," meaning Chapter 5 of the Communications act, and do not mention, let alone defend or displace, the regulatory authority of the states.  The two provisions thus prevent the FCC itself, and not the states, from imposing common carrier regulations on either information services or private mobile services.

Indeed, the D.C. Circuit in *Mozilla* held that Section 153(51) is a limitation on the FCC's regulatory authority and does not affect the states' authority. *Mozilla*, 940 F.3d at 79. There, the FCC had argued that the section provided the agency with the requisite source of regulatory authority to support its Preemption Directive against state regulation. *Id.* at 79.  But the D.C. Circuit quickly disposed of this argument.

*See id.* Looking to the text of Section 153(51), the court said that this provision could not be a source of regulatory authority because it is a limitation on the FCC's authority. *Id.* The court also observed that Congress would not hide such an expansive source of regulatory and preemptive authority in this part of the statute. *Id.* As the D.C. Circuit said:

> It also would make no sense for Congress to bury the enormously far-reaching and consequential authority to override every single State's *statutorily conferred* power to regulate intrastate communications deep within a list of fifty-nine definitions in a non-regulatory portion of the statute, and then articulate the relevant definition as a *restriction* of the Commission's power.

*Id*. We follow the D.C. Circuit's well-reasoned decision. Here, the service providers cannot stretch a provision limiting the FCC's power to regulate common carriers into an overarching grant of preemptive power over the states' authority to regulate net neutrality. *See id.*

Other provisions of the statute demonstrate that Congress knew how to preempt state authority when it wanted to. The Communications Act contains numerous express preemption provisions. *See, e.g.*, 47 U.S.C. §§ 223(f)(2), 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section"), 253(a), 253(d) ("If . . . the Commission determines that a State or local government has permitted or imposed any statute . . . that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute . . . to the extent necessary to correct such violation or

inconsistency."), 332(c)(3) ("State Preemption . . . [n]otwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have the authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service . . . "). Sections 153(51) and 332(c)(2) contain no such express preemption provisions. We should understand from the omission that Congress did not intend Sections 153(51) and 332(c)(2) to have preemptive effect.

If there were any remaining doubt, the Savings Provision in Section 601(c)(1) of the Telecommunications Act provides even more evidence that Section 153(51) was not intended to limit the states' authority. *See* Telecommunications Act of 1996, Pub. L. No. 104-104, § 601(c)(1), 101 Stat. 56, 143 (1996), *reprinted in* 47 U.S.C. § 152 note. The Savings Provision says "[t]his Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless *expressly* so provided in such Act or amendments." *Id*. (emphasis added). Because the 1996 Amendments added Section 153(51) to the Communications Act, and Section 153(51) contains no express statement of preemption, the Savings Provision precludes any inference of preemptive intent. *See* Telecommunications Act of 1996, § 153(49). Therefore, the service providers cannot successfully maintain that the California statute conflicts with the Communications Act.

### III.   The California Statute Does Not Impermissibly Touch on the Field of Interstate Communications

Even in the absence of an express conflicting Congressional command, a state law may be preempted when

federal law so thoroughly occupies a legislative field as to demonstrate Congressional intent to exclude all state law. *See*, *e.g.*, *Arizona v. United States*, 567 U.S. 387, 399 (2012). In this appeal, the service providers argue that the field of interstate communications services is exclusively federal and that SB-822 therefore impermissibly regulates in that field.

SB-822 limits its application, however, to broadband internet access services "provided to customers in California" and to internet service providers that "provide[] broadband Internet access service to an individual, corporation, government, or other customer in California." Cal. Civ. Code § 3100(b), (k). In *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 433 (9th Cir. 2014) ("*GLAAD*"), we reviewed an analogous California statute that regulated online content only when it was accessed by California viewers. *Id.* at 433. We held that such state regulation of internet services does not have the practical effect of regulating wholly interstate conduct. *See id*.

The service providers nevertheless resort to Section 152 of the Communications Act to argue that any state regulation of intrastate communications that touches on interstate communications, such as SB-822, impermissibly regulates in that field. 47 U.S.C. § 152. But Section 152 merely excludes the FCC from regulation of intrastate communications. It states in relevant part that "[t]he provisions of this chapter shall apply to all interstate and foreign communication" except that "nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to . . . intrastate communication service." 47 U.S.C. § 152.

The service providers also point to a statement by the Supreme Court interpreting Section 152 as affording the FCC "plenary authority" over interstate communications. *Louisiana*, 476 U.S. at 360. They ask us to conclude that state regulations may not touch on interstate communications. Yet the division of regulatory authority is not so simple and *Louisiana* does not go so far. The *Louisiana* Court rejected any interpretation of the Communications Act that would neatly divide power between federal and state authority. *See id.* The Supreme Court said in reference to Section 152:

> while the Act would seem to divide the world into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction—in practice, the realities of technology and economics belie such a clean parceling of responsibility. This is so because virtually all telephone plant that is used to provide intrastate service is also used to provide interstate service, and is thus conceivably within the jurisdiction of both state and federal authorities. Moreover, because the same carriers provide both interstate and intrastate service, actions taken by federal and state regulators within their respective domains necessarily affect the general financial health of those carriers, and hence their ability to provide service, in the other "hemisphere."

*Id*.    Contrary to the service providers' contention, the *Louisiana* Court described the Communications Act as establishing dual state and federal regulatory authority. *Id.* at 375; *see also Mozilla*, 940 F.3d at 81 (noting "the Communications Act's vision of dual federal-state authority and cooperation").

Indeed, we have previously rejected field preemption arguments that are similar to those made on this appeal. In *GLAAD*, the plaintiff, the Cable News Network, Inc. ("CNN"), argued that the Telecommunications Act as amended by the Twenty-First Century Communications and Video Accessibility Act, occupied the legislative field of closed captioning of videos on the internet. 742 F.3d at 428–29. Accordingly, CNN contended that a California state law that regulated the closed captioning of CNN's online videos impermissibly entered that field. *See id.* at 428–29, 433. We held that Congress did not preempt the field of closed captioning, principally because the FCC had left room for state laws to supplement the federal regulatory scheme. *See id.* at 428–29.

Similarly, in the field of interstate broadband services, states have taken advantage of the space left for state laws to supplement the federal scheme. There are many illustrations cited by states in amici briefs. For example, Maine, Nevada, and Minnesota have all regulated broadband providers by enacting laws requiring them to obtain permission from consumers before sharing the consumers' data. *See* 35-A Me. Rev. Stat. Ann. § 9301; Minn. Stat. § 325M.01 et seq.; Nev. Rev. Stat. § 205.498.     And the FCC itself recently acknowledged the states' role in, among other things, policing fraud, taxation, general commercial dealings, and enforcing fair business practices in the field of interstate broadband

services. 2018 Order ¶ 196. Accordingly, the realities of today show a dual-system of regulation that refutes the service providers' argument.

The Communications Act itself reflects a federal scheme that leaves room for state regulation that may touch on interstate services. For example, Section 253, which removes barriers to entry to the interstate and intrastate telecommunications industry, expressly preserves a role for states to protect consumer rights in this field. 47 U.S.C. § 253(a), (b). The express preemption provisions located throughout the Communications Act are predicated on the assumption that states otherwise would have concurrent authority to regulate interstate services. To illustrate, Section 253(a) provides that "[n]o State or local statute or regulation . . . may prohibit . . . the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). If Congress had intended the Communications Act to preempt state regulation touching on any interstate communications, there would be no need for any express preemption provisions.

As the Supreme Court said in *Louisiana*, the argument that states' regulatory authority "should be confined to intrastate matters which are separable from and do not substantially affect interstate communication . . . misrepresents the statutory scheme . . ." 476 U.S. at 373–74 (internal quotations omitted). The district court correctly concluded that the service providers are unlikely to prevail on their argument that SB-822 is field preempted by the Communications Act.

## Conclusion

The judgment of the United States District Court for the District of Eastern California denying a preliminary injunction that would bar enforcement of SB-822 is **AFFIRMED**.

WALLACE, Circuit Judge, concurring:

I concur in the majority opinion. I write separately to express my concern that "in some cases, parties appeal orders granting or denying motions for preliminary injunctions in order to ascertain the views of the appellate court on the merits of the litigation." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982). Here, we are solely reviewing a denial of a preliminary injunction, *see* Opin. at 24, 33, and we thus can express no view on issues arising after a trial dealing with a permanent injunction. *See, e.g.*, *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013) ("We have repeatedly emphasized the preliminary nature of preliminary injunction appeals.").

I emphasize that appealing from a grant or a denial of a preliminary injunction to obtain an appellate court's view of the merits often leads to "unnecessary delay to the parties and inefficient use of judicial resources." *Sports Form*, 686 F.2d at 753. These appeals generally provide "little guidance" because "of the limited scope of our review of the law" and "because the fully developed factual record may be materially different from that initially before the district court." *Id.* Given the limitations of reviewing an order granting or denying a preliminary injunction, we have repeatedly

cautioned parties that a disposition of a preliminary injunction appeal is not an adjudication on the merits and that the parties should not "read too much into" such holdings. *Gregorio T. v. Wilson*, 59 F.3d 1002, 1005 (9th Cir. 1995).

We have also "repeatedly admonished district courts not to delay trial preparation to await an interim ruling on a preliminary injunction." *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018). Here, the plaintiffs filed a renewed motion for a preliminary injunction on August 5, 2020. The district court denied the motion on February 23, 2021. The plaintiffs then filed a notice of appeal on March 9, 2021. Since then, it appears that there has been little progress in the case. Given the purported urgency of the case's resolution, the parties might "have been better served to pursue aggressively" their claims in the district court, "rather than apparently awaiting the outcome of this appeal" for nearly one year. *Id.* at 584 (citation omitted).